# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:02CV-3-M

DEBBIE ALLEN,                                                                    PLAINTIFF

v.                          <u>MEMORANDUM OPINION AND ORDER</u>

LIFE INSURANCE COMPANY OF NORTH AMERICA,                    DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court upon Cross-Motions for Summary Judgment on the Administrative Record filed by Plaintiff, Debbie Allen [DN 39], and Defendant, Life Insurance Company of North America [DN 43]. Fully briefed, this matter is ripe for decision. For the reasons discussed below, Defendant's Motion for Summary Judgment on the Administrative Record is granted and Plaintiff's Motion for Summary Judgment on the Administrative Record is denied.

## I. BACKGROUND

Plaintiff, Debbie Allen, was an investment broker for A.G. Edwards. While employed at A.G. Edwards, Allen participated in a long-term disability insurance plan issued by Defendant, Life Insurance Company of North America ("LINA"). (LINA-2_001162; Group Insurance Policy LK-7436.) LINA also acts as a claim administrator for the Plan. Benefits are payable under the Plan only if LINA receives "due proof" that "the Employee became Totally Disabled while insured under this policy" and that the "Total Disability has continued for a period longer than the Benefit Waiting Period shown in the Schedule." (LINA-2_001175.) An employee is considered totally disabled "if because of Injury or Sickness, he is unable to perform all the material duties of his regular occupation." (LINA-2_001165.) The insurance policy also contains a mental illness, alcoholism and

drug abuse limitation that provides in part as follows: "The Insurance Company will pay Monthly Benefits for no more than 24 months during an Employee's lifetime for Total Disability caused or contributed to by any one or more of the following conditions: . . . Bipolar affective disorder (manic depressive syndrome) . . . Depressive disorders . . . Anxiety disorders . . . Mental illness." (LINA-2_001176.)

On March 17, 1997, LINA received a long-term disability ("LTD") claim from Allen. The Attending Physician's Statement of Disability, a part of Allen's claim, was executed and signed by Allen's treating psychiatrist, Willis H. Marshall, M.D. Dr. Marshall diagnosed Allen with bipolar disorder, depression, post-traumatic stress disorder, and hypothyroidism due to suppression by Prozac therapy. (LINA-2_000258; LINA-2_000370.) By letter dated June 11, 1997, LINA approved Allen's claim for LTD benefits. The letter further stated that "the insurance company will pay monthly benefits for no more than 24 months . . . during the employee's lifetime for total disability caused or contributed to by mental illness while the employee is not confined in a hospital." (LINA-2_000235.)

By letter dated July 31, 1998, LINA notified Allen that her benefits would expire on January 2, 1999. In September of 1998, Allen contacted LINA and informed them that she had a physical disability, rather than a mental disability. On October 30, 1998, Allen called LINA stating that "[s]he recently tested positive for late lyme disease." (LINA-2_000117.) LINA terminated Allen's benefits on January 2, 1999, on the basis that the medical condition was Bipolar Affective Disorder with Depression, a condition for which the insurance policy has a 24 month maximum limit for payment. On January 20, 1999, Allen appealed the termination of her disability benefits. Allen claimed the new medical evidence reflected that she was suffering from Lyme Disease which

provided grounds for continued LTD benefits.  (LINA-2_000013.)  Allen argued that her original symptoms had actually been caused by physical diseases and covered by the Plan.  (Id.)

On appeal, Allen submitted medical records from the Graves Gilbert Clinic indicating that as of October 1998 she was being treated for possibility of Lyme's disease.  Dr. Blaine Lisner, Allen's treating physician, informed LINA that "[w]ith several neurological as well as laboratory tests that have been found to be positive, it is my believe [sic] as well as the belief of an independent physician, that the patient has Lyme disease and requires active treatment."  (LINA-2_000613; February 15, 1999, Letter.)  In April of 1999, Dr. Lisner submitted a Physical Ability Assessment indicating that Allen was "confined to home at this time, numerous neurological deficits, peripheral nerve damage, balance difficulties, loss of vision, blurred vision, patient undergoing extensive IV Therapy, damage to left hand – left side of body."  (LINA-2_000433, LINA-2_000497.)  By letter dated August 18, 1999, Dr. Lisner also indicated that the results of the Brian SPECT performed in January of 1999 confirmed and supported the present clinical syndrome of Chronic Neurological Dysfunction. Dr. Lisner noted that "[t]he finding of global hypoperfusion in a hetergeneous pattern throughout the brain is not an acute or recent occurrence.  It is entirely consistent in Ms. Allen's clinical case review that she has had organic brain disease (encephalopathy) for the last two or more years.  The evidence of white matter disease is additional confirmation of the slow and progressive nature of advanced Lyme disease." (LINA-2_000470.)

Additionally, Allen submitted a neuropsychological evaluation conducted by Dr. Claudene F. Oliva conducted in April of 1999.  (LINA-2_000449-455.)  Dr. Oliva determined that Allen suffers from mild to moderate impairment of functions normally associated with central nervous system functions.  (LINA-2_000454.)  Dr. Oliva found that "although Ms. Allen's test scores are

generally average, she has experienced a huge drop in performance level from her prior functioning levels." (Id.)

In response to the Allen's appeal, LINA obtained two independent file reviews from internal disease specialists, Dr. John Mendez and Dr. Russell Stumacher. In May of 1999, Dr. Mendez concluded that the information that LINA provided to him "substantiates the clinical diagnosis of Lyme disease." (LINA-2_000528.) Specifically, Dr. Mendez concluded:

> The provided information summarized above substantiates the clinical diagnosis of Lyme disease. Although it does not meet the surveillance case definition, the history does substantiate: a) history of tick attachment between May and August 1996, b) " . . . followed a few days later by an oval-shaped pink/red rash, that lasted 1 to 2 weeks, with central clearing and raised "hot" edges, "on the distal thigh above the right knee." . . . c) "migrane-like headaches, pain in multiple joints, including right knee, both elbows, wrists and finger" and d) a history for trigeminal nerve symptoms. . . . Although the serum studies were, at best, borderline (serum ELISA) and unconfirmed by Western Blot testing, the clinical picture is consistent with the clinical diagnosis.

(LINA-2_000528; May 28, 1999 Letter.) Dr. Mendez could not confirm a diagnosis of total disability due to his inability to contact Allen's treating physician. (LINA-2_000529.)

In June of 1999, Dr. Stumacher submitted his file review. Dr. Stumacher recognized that Allen had "experienced virtually continuous fatigue, impaired mental status, myalgias, arthralgias, low grade temperature," as well as "recurrent rashes, intermittent joint swelling, left temporomandibular joint tenderness, changes consistent with sensory neuropathy involving the left lower extremity, and an abnormal central nervous system SPECT scan with multiple areas of hypoperfusion suggesting encephalopathy, vasculitis, or demyelinating disease." (LINA-2_000513; June 16, 1999, Letter.) Dr. Stumacher also noted that Allen had a borderline positive ELISA Lyme disease antibody test, nondiagnostic Western Blot confirmatory studies, as well as a negative serum PCR levels and urine Lyme disease antigen studies. (Id.) In his assessment of the records, Dr.

Stumacher indicated that "[i]n the strictest sense, Ms. Allen has no evidence to support a diagnosis of tertiary Lyme disease, although she has had objective illness, including fever, peripheral neuropathy, multiple and recurrent skin lesions, as well as an abnormal SPECT scan of the central nervous system." (LINA-2_000514.) Dr. Stumacher opined that "[i]t is difficult to ignore the clear cut objective physical abnormalities which have characterized Ms. Allen's illness. She has had a fairly reasonable work up not only for Lyme disease but also other diseases, including vasculitis." (LINA-2_000514.) Further, Dr. Stumacher opined that "the patient is probably physically impaired to at least some degree." (LINA-2_000515.) He indicated that he could not state an opinion on whether she was totally disabled without additional objective testing. (Id.)

After reviewing the appeal and the additional independent file reviews, LINA upheld its decision to deny additional LTD income benefits stating that "[b]ased on the fact that we have not received any additional medical information that would support an ongoing, physically disabling condition due to Lyme Disease as opposed to a mental illness as defined above, we have determined that you are not eligible for continued Long Term Disability benefits beyond January 2, 1999." (LINA-2_000437; October 1999 Denial Letter.)

Allen then filed this lawsuit alleging that Defendant had wrongfully denied Allen's LTD benefits. The parties filed cross-motions for summary judgment based on the administrative record. By Memorandum Opinion and Order entered January 29, 2003, the Court reversed LINA's denial of Allen's claim for LTD benefits and remanded Allen's claim to the Plan Administrator. Considering the conflict of interest and the treating physician rule[1], the Court held that LINA's

_____

[1]The "treating physician rule" followed in the Court's first Memorandum Opinion and Order no longer applies in the ERISA context. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)

decision that a mental illness caused or contributed to Allen's total disability was arbitrary and capricious. The Court remanded the claim to the Plan Administrator to determine whether Allen qualified for LTD benefits due to a physical condition that rendered her totally disabled.

After remand to the Plan Administrator, LINA denied Allen's claim for LTD benefits "[d]ue to Ms. Allen's failure to cooperate in the claim review process and, more specifically, her apparent refusal to submit to the requested IME [Independent Medical Examination]." (November 24, 2004, Letter at 4.) Having concluded that LINA's November 24, 2004, denial notification failed to comply with ERISA's procedural requirements outlined in 29 U.S.C. § 1133 and its corresponding regulations, the Court remanded the case to the Plan Administrator for a determination of Allen's LTD claim.

On remand, LINA obtained Independent Medical Examinations ("IME") of Allen from Dr. Denise K. Griffin, a neurologist, and Dr. M. Muhahid Baig, a board certified physician in endocrinology and metabolism. After conducting a neurological exam of Allen, Dr. Griffin concluded that "the claimant has no evidence of focal neurologic disease and her neurological examination is normal." In her report dated May 18, 2006, Dr. Griffin opined:

> From a neurologic perspective, I am unable to state with any reasonable degree of medical certainty whether or not Ms. Allen has neuro borreliosis [Lyme disease]. The reasons for this have already been discussed. In my opinion, the physical ability assessment form submitted by your company is not applicable to the claimant's presumptive diagnosis, which is that of an infectious disease (Lyme disease). In my opinion, a board certified fellowship trained infectious disease specialist is better able to determine whether or not Ms. Allen has Lyme disease than I. Of course, if the claimant does not have Lyme disease she cannot have neurologic Lyme disease (neuro borreliosis). Unfortunately, my review of records submitted presents no objective support of Lyme neuro borreliosis and her neurologic exam is non-focal. I would defer this diagnosis to a board certified actively practicing infectious disease doctor.

> In regard to the claimant's symptoms of difficulty with concentration, I am unable

to state with any degree of reasonable medical certainty whether or not these problems are functional versus organic. If the cognitive problems are not organic, I am unable to state with any reasonable degree of medical certainty whether or not they are due to an infectious disease problem versus any other potential cause of cognitive dysfunction (e.g. neoplastic, vascular, degenerative, substance abuse, etc).

(LINA-2_001257.)

LINA requested Dr. M. Muhahid Baig, a board certified physician in endocrinology and metabolism, to examine Allen's hypothyroidism. Dr. Baig's assessment of Allen's condition listed the following physiological conditions: hypothyroidism, Hashimoto's thyroiditis, Lyme disease, Osteoarthritis, HHV6, HHV7 disease. (LINA-2_001240.) Dr. Baig indicated that he could not make a final determination of her condition without her recent Thyroid Stimulating Hormone ("TSH") results.

Relying on these IMEs and a review of the claim by LINA's medical director, LINA concluded that the records do not support the presence of neuro borreliosis (Lyme disease) or that her cognitive complaints are solely due to a physical condition. LINA denied Allen's claim stating that

Ms. Allen has reached the maximum 24 months of benefits under this policy for disability due to mental health conditions. The medical information does not support Ms. Allen's inability to perform a sedentary occupation solely due to a physical condition and she does not meet the definition of disability.

(August 7, 2006, Letter at 3; LINA-2_001232.) By letter dated February 2, 2007, Allen appealed the denial of disability benefits.

In response to the appeal, LINA obtained an independent file review from Dr. Gary P. Greenhood, an infectious disease specialist. In his File Review Report dated April 7, 2007, Dr. Greenhood noted that in 1998, Dr. Lisner offered a diagnosis of Lyme disease and that "Dr. Liegner confirmed the diagnosis in 1999. Dr. Cichon concurred with the diagnosis in 2001. In 2004, Dr.

Reifsnyder may have also agreed with the diagnosis of Lyme disease." (LINA-2_002562.)[2] Upon a review of the entire file, Dr. Greenhood opined that the submitted materials do not support a diagnosis of Lyme disease. Dr. Greenhood indicated that the diagnosis of Lyme disease is established by either the (1) documentation of erythema migrans or (2) the combination of an objectively abnormal finding consistent with Lyme disease that is not explained by an alternative diagnosis and a positive serological test result for Lyme disease. (LINA-2_002563.) Dr. Greenhood noted that "while an oval rash with central pallor is alleged to have been present in 1996, there is no report that this was observed by a medical professional." (Id.) Dr. Greenhood also found that "[t]here are no reports of those findings seen in Lyme disease -- such as inflammatory, monoarticular or oligoarticular arthritis; meningitis; heart block, etc." (Id.) Similarly, according to Dr. Greenhood, the reports of " 'Bell's palsy in either 1996 or 1998 and something about the right trigeminal nerve" are unsubstantiated. (Id.) Dr. Greenhood further opined that

> [m]ost in conflict with a diagnosis of late stage Lyme disease are results of serological testing. In October of 1998, a first-tier IgM test was equivocal; however, Western Blot testing was clearly negative with only one band positive on IgG testing. In January of 1999, first-tier testing was again equivocal; no reports of a Western Blot test from 1999 are submitted. In March of 2004, first-tier testing was negative, as were results of immunoblot testing. It appears therefore, that intermittently equivocal (never positive) first-tier tests have not indicated infection with Borrelia burgdorferi. Cerebrospinal fluid was thoroughly tested for evidence of infection with B. burgdorferi; all results were unremarkable."

(LINA-2_0002563-002564.) Based on these test results and on Dr. Denise Griffin's IME of Allen, Dr. Greenhood stated that the submitted materials do not support a diagnosis of neuro borreliosis

---

[2] The record reflects Dr. Kenneth Liegner, a Lyme disease specialist, examined Allen in January of 1999 and that Dr. Michael Cichon treated Allen for Lyme disease during 2002. (LINA-2_000989; LINA-2_001005.) The record indicates that Dr. David Reifsnyder also saw Allen in 2002 as well. (LINA-2_001141.)

(Lyme disease) and that he was "unable to support any restrictions or limitations" on the basis of an infectious disease. (LINA-2_002564.)

Relying on Dr. Greenhood's review of the medical records, LINA denied Allen's appeal finding that "[t]here is insufficient evidence in the file to establish that Mrs. Allen suffers a physical illness that has caused her to be unable to perform all the material duties of her regular occupation." (June 25, 2007, Letter at 5; LINA-2_002579.) On December 21, 2007, Allen submitted her final appeal of LINA's denial of disability benefits.

In response to the appeal, LINA obtained an additional independent file review from Dr. Richard Martinello, an infectious disease specialist. After examining the medical records, Dr. Martinello concluded that

> the claimant has a number of well documented problems for which she was being treated during the review period: namely, hypothyroidism, depression, anxiety, cholecystitis, carpal tunnel syndrome and overall debilitation. The claimant also has some evidence for a number of other disorders; namely, IgG subclass deficiency and obstructive lung disease. Concern has been raised about chronic Lyme disease. However, the laboratory test results provided are not consistent with an infection due to the bacteria responsible for Lyme disease: Borrelia burgdorferi. The meaning of the SPECT test results is unclear and this test is widely acknowledged to be very non-specific. While the claimant has exhibited a wide range of problems that have impacted her ability to function and her quality of life, I am unable to find sufficient evidence that these "disabilities" are a result of Lyme disease or another infectious disease. . . .

(LINA-2_002879-002880.) Dr. Martinello also found that "[f]or the time period of 01/02/1999 through the present, the information does not provide sufficient information to conclude that there are any restrictions/limitations due to Lyme disease or any other infectious disease." (LINA-2_002880.) According to Dr. Martinello, "[t]his claimant has a number of apparent restrictions and limitations that appear to be associated with her psychiatric and medical illnesses, as outlined above, and not with any infectious disease process. While it is possible that the claimant may have had an

acute infection with Lyme disease in the past (1996), there is not sufficient information provided to show that her constellation of problems are at all or have been related to Lyme disease." (<u>Id.</u>)

Relying in part on the medical record review of Dr. Martinello, LINA once again denied Allen's appeal finding that

> the information available does not provide sufficient information to conclude that there are any restrictions due to Lyme disease or any other physical condition from January 1999 through the present that would preclude Ms. Allen from performing a sedentary occupation. The medical documentation supports that Ms. Allen has difficulties with concentration, tolerating stress, and interacting with peers, supervisors and public. These limitations are caused or contributed to by Ms. Allen's diagnoses of bipolar disorder and depression. Benefits for these diagnoses are limited by the Mental Illness, Alcoholism and Drug Abuse Limitation provision. The maximum amount of benefits were paid to Ms. Allen under the Mental Illness, Alcoholism and Drug Abuse Limitation provision. Therefore, we must uphold our previous decision to deny Ms. Allen's claim.

(LINA-2_002890; July 18, 2008, Letter.)

On January 13, 2009, Allen requested the Court to reopen the case and return it to the active docket for further judicial review of LINA's denial of her LTD claim. The parties have now filed cross-motions for summary judgment on the administrative record.

## II. STANDARD OF REVIEW

The Court reviews LINA's decision to deny Allen benefits under "the highly deferential arbitrary and capricious standard of review" because, as both parties acknowledge, LINA has discretionary authority to interpret and apply the plan. <u>Killian v. Healthsource Provident Adm'rs, Inc.</u>, 152 F.3d 514, 520 (6th Cir. 1998) (quotation omitted). The arbitrary and capricious standard "is the least demanding form of judicial review . . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." <u>Perry v. United Food & Commercial Workers Dist. Unions 405 & 442</u>, 64 F.3d 238,

241 (6th Cir. 1995). Put another way, a decision will be upheld "if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." Baker v. United Mine Workers of America Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991).

Of course, while the arbitrary and capricious standard is deferential "it is not . . . without some teeth." McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003) (quotation omitted). "[M]erely because [a court's] review must be deferential does not mean [its review] must also be inconsequential . . . . the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). "The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" Evans v. UnumProvident Corp., 434 F.3d 866, 876 (6th Cir. 2006) (quotation omitted).

To determine whether a plan administrator's decision to deny benefits was arbitrary and capricious, courts consider not just the medical evidence and opinions, but also whether there is a conflict of interest, whether the plan administrator failed to give consideration to the Social Security Administration's determination that the applicant was totally disabled, and whether the plan administrator based its decision to deny benefits on a file review instead of conducting a physical examination of the applicant. DeLisle v. Sun Life Assurance Co. of Canada, 558 F.3d 440 (6th Cir. 2009); Bennett v. Kemper Nat. Services, Inc., 514 F.3d 547 (6th Cir. 2008); Calvert v. Firstar Finance, Inc., 409 F.3d 286 (6th Cir. 2005). Such findings do not change the standard of review, but they do factor into the Court's analysis when determining whether the administrator's decision

was arbitrary or capricious.  Bennett, 514 F.3d at 552.

## III.  DISCUSSION

Allen argues that LINA arbitrarily and capriciously denied her claim for long-term disability benefits because (1) the administrative record substantiates that she suffers from Stage IV Lyme disease which prevents her from performing all the material duties of her regular occupation as a stockbroker and (2) the administrative record is devoid of any support for LINA's conclusion that Allen suffers from a mental illness that causes or contributes to her disability.  (Plaintiff's Brief, p. 2, 13.)  Allen also argues that LINA's conflict of interest as both administrator of the plan and payor of claims, its failure to meaningfully distinguish the Social Security Administration's contrary decision, its failure to have an IME performed by an infectious disease specialist, and its failure to determine whether she could presently return to her career as an investment professional support a finding that LINA acted arbitrarily in denying her claim. (Id. at 12, 14-18.)

LINA counters that Allen failed to prove that she is physically disabled from performing her sedentary occupation.  Specifically, LINA maintains that numerous independent physicians opined that Allen did not have Lyme disease and that she does not suffer physical limitations and restrictions due to Lyme disease or any other infectious disease.  LINA also argues that application of the mental illness provision is appropriate because Allen's neurological problems are easily attributable to psychiatric disease which is well documented by the medical records and her own admissions.   Finally, LINA argues that Allen must reimburse it for the amount of the LTD benefit overpayment created by Allen's retroactive Social Security disability award.   Defendant suggests that the Court remand this matter to the Plan Administrator for a determination and calculation of the appropriate benefit offset and reimbursement amount owed by Allen.

**A. Conflict of Interest**

For purposes of ERISA claims, there is a conflict of interest where the insurance company is both the "decision maker, determining which claims are covered, and the payor of those claims." Calvert, 409 F.3d at 292. This is true even where the administrator of the plan is an insurance company and not the employer of the potential beneficiary. DeLisle, 558 F.3d at 445. In this case, LINA is both the decision-maker and payor under the insurance policy. In fact, one yearly payment of LTD benefits to Allen is approximately $46,000. Considering Allen's age, payment of this claim beyond the 24 month limitation period would be expensive for LINA. Thus, there is a significant financial incentive for the insurance company to terminate coverage or to deny a claim. Accordingly, the Court will "view [LINA's] explanation [for denying Allen's claim for benefits] with some skepticism" and will weigh this conflict as a factor in deciding whether LINA's decision was arbitrary and capricious. Moon, 405 F.3d at 381-82.

**B. Social Security Benefits Determination**

Allen argues that there is no evidence that LINA considered the Social Security Administration's determination that she was disabled under the Social Security Act, "much less that it attempted to offer any meaningful discussion of why it could validly take a position different from the [position the] Social Security Administration had taken on the same medical records." (Plaintiff's Brief at 18.)

An award of disability benefits from the Social Security Administration ("SSA") "does not automatically entitle a party to disability coverage under an insurance plan." Calvert, 409 F.3d at 294. However, the Sixth Circuit has explained that such a discrepancy is "far from meaningless." Id. A reviewing court should favor finding that an administrator's decision to deny benefits was

arbitrary and capricious where an applicant is encouraged to apply for Social Security benefits, the plan administrator benefits from payouts by the SSA, and the administrator fails to adequately explain the discrepancy between the two decisions.  Bennett, 514 F.3d at 554.

In the present case, LINA encouraged Allen to apply for benefits with the SSA, and it received, or would have received, a deduction based on those benefits.  The SSA awarded Allen total disability benefits.  Specifically, the Administrative Law Judge ("ALJ") concluded that "[t]he medical evidence establishes that the claimant has the following severe impairments: residuals from Lyme disease and an adjustment disorder with depression and anxiety." (LINA-2_000415.)   A review of the decision reflects that the ALJ determined that Allen was not prevented from engaging in sedentary work solely by virtue of her physical limitations as a result of her Lyme disease, but that Allen's "adjustment disorder with depression and anxiety" combined to render her totally disabled.  (Id.)

Contrary to Allen's argument, LINA's July 18, 2008, denial letter specifically cites the Social Security decision and explains why it is consistent with, and in support of, LINA's denial of Allen's physical disability benefit claim.  In relevant part, LINA stated:

> We are aware that Ms. Allen qualified for Social Security Disability Income benefits, which were awarded at the ALJ level in May 2000.  The ALJ's report concluded that she was not unable to engage in sedentary work solely by virtue of her physical limitations; but the effects of her "substantial impairment in the ability to maintain concentration and attention, tolerate work stress, adapt to changes in the work setting and interact with supervisors, co-workers and the general public" combined to render her totally disabled.
>
> This conclusion is consistent with the logic behind our denial and the very wording of the Mental Illness Limitation.

(LINA-2_002890.)  The final denial letter reflects that LINA ultimately denied Allen's claim for LTD benefits finding that "the information available does not provide sufficient information to

14

conclude that there are any restrictions due to Lyme disease or any other physical condition from January 1999 through the present that would preclude Ms. Allen from performing a sedentary occupation." (LINA-2_002890). Thus, the SSA decision that Lyme disease alone does not warrant an award of total disability absent Allen's "adjustment disorder with depression and anxiety" is consistent with the finding by LINA that neither Lyme disease or any other physical condition prevents Allen from performing a sedentary occupation. Thus, this determination by LINA is consistent with the SSA's disability determination and does not support a finding that LINA was arbitrary and capricious in denying Allen's claim.

### C. Independent Medical Exams/File Reviews

Allen argues that LINA's decision to deny her LTD benefits was arbitrary and capricious because LINA did not have an IME performed by an infectious disease specialist. The record reflects that in response to Dr. Lisner's physical ability assessment, LINA had two separate IMEs performed by specialists in neurology and endocrinology and then solicited independent file reviews by two separate board certified infectious disease specialist. The Sixth Circuit has repeatedly noted that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." Calvert, 409 F.3d. at 296. While "the failure to conduct a physical examination-especially where the right to do so is specifically reserved in the plan-may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination," id. at 295, the record reflects that upon remand LINA exercised its right to conduct two separate IMEs of Allen and two independent file reviews. Further, in conducting the independent file reviews, the infectious disease specialists considered the entire record available to them, relied on the entire file as a whole including the laboratory testing ordered by Allen's treating physicians, and

provided thorough summaries of the documents reviewed. See <u>Nuyt v. Sun Life Assur. Co. of</u> <u>Canada</u>, ___ F. Supp.2d ___, 2009 WL 5214994 (W.D. Ky. December 22, 2009). Accordingly, the Court rejects Allen's argument that LINA acted arbitrarily and capriciously by not having an IME performed by an infectious disease specialist.

### D. Present Ability to Perform as Stockbroker

Allen incorrectly argues that LINA acted arbitrarily by failing to consider whether Allen is *presently* able to perform the work of a stockbroker given the " significant changes in the financial world since [Allen] was last employed as a financial professional in October 1996." (Plaintiff's Brief at 18.) Contrary to Allen's argument, the relevant inquiry is whether Allen was disabled from performing her occupation at or before her benefits ceased in 1999. See <u>Likas v. Life Ins. Co. of</u> <u>North America</u>, 347 Fed. Appx. 162, 167-168 (6th Cir. Sept. 21, 2009)(any deterioration in health after the date coverage was denied due to finding that participant was not disabled was irrelevant); <u>see also</u> Plaintiff's Brief at 3. Significant changes in the financial world over the last 13 years are not relevant to whether Allen could have performed her job as a stockbroker in 1999 when her benefits were terminated.

### E. LINA's Claim Denial

LINA denied Allen's LTD benefits claim finding that the administrative record "does not provide sufficient information to conclude that there are any restrictions due to Lyme disease or any other physical condition from January 1999 through the present that would preclude Ms. Allen from performing a sedentary occupation." (LINA-2_002890). Allen argues that this decision was arbitrary and capricious because LINA disregarded the medical findings in the record that confirmed that she suffered from Lyme disease and ignored the opinion of her treating physician, Dr. Lisner,

who concluded that she was incapable of working. Thus, considering the conflict of interest discussed above, the question before the Court is whether LINA's denial of Allen's LTD benefits claim is the result of a "deliberate, principled reasoning process" and is supported by substantial evidence. <u>Elliott v. Metro. Life Ins. Co.</u>, 473 F.3d 613, 617 (6th Cir. 2006).

Clearly, there is conflicting evidence in the record regarding whether Allen has Stage IV Lyme disease: Dr. Blaine Lisner categorically states that Ms. Allen has Lyme disease;[3] Dr. John Mendez concluded that the information LINA provided him substantiates the clinical diagnosis of Lyme disease; Dr. Stumacher opined that Ms. Allen has no evidence to support a diagnosis of tertiary Lyme disease; Dr. Griffin concluded that the records submitted presented no objective support of Lyme disease and Ms. Allen's neurologic exam was non-focal; and finally, both Dr. Greenhood and Dr. Martinello in their file reviews concluded that the submitted materials neither support a diagnosis of Lyme disease, nor any restrictions or limitations from Lyme disease or infectious disease.

Significantly, there is also conflicting evidence in the record regarding whether Allen suffers any restrictions due to Lyme disease or other physical conditions that would preclude her from performing a sedentary occupation, such as a stockbroker. The only evidence in the record that Lyme disease precludes Allen from performing a sedentary occupation is Allen's treating physician, Dr. Blaine Lisner, who opined that Allen was physically unable to work in April 1999, noting that she was "confined to home at this time, numerous neurological deficits, peripheral nerve damage,

---

[3]In his File Review Report dated April 7, 2007, Dr. Greenhood noted that in 1998, Dr. Lisner offered a diagnosis of Lyme disease and that "Dr. Liegner confirmed the diagnosis in 1999. Dr. Cichon concurred with the diagnosis in 2001. In 2004, Dr. Reifsnyder may have also agreed with the diagnosis of Lyme disease." (LINA-2_002562.)

balance difficulties, loss of vision, blurred vision, patient undergoing extensive IV Therapy, damage to left hand – left side of body." (LINA-2_000433; Dr. Lisner's Physical Ability Assessment of Allen.) Allen's other treating physicians -- Dr. Marney, Dr. Hardcastle, Dr. Blevins, and Dr. Cavanah – did not provide the requested information regarding the extent of Allen's physical limitations and restrictions. (LINA-2_000637; LINA-2_000642; LINA-2_000695; LINA-2_000699.) In contrast to Dr. Lisner, none of the physicians who conducted the IMEs or the file reviews found Allen totally disabled as a result of a physical condition. In fact, Drs. Greenhood and Martinello concluded that Allen did not suffer any restrictions due to Lyme disease or other physical conditions that would preclude her from performing a sedentary occupation. (LINA-2_002564; LINA-2_002890.)

LINA's reliance on the opinions of its reviewing consultants and physicians rather than Dr. Lisner's medical opinion does not render its decision arbitrary and capricious. "Nothing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003); Calvert, 409 F.3d at 293. "As long as a plan administrator offers a reasonable explanation based upon the evidence for its decision, it may choose to rely upon the medical opinion of one doctor over that of another doctor." Roumeliote v. Long Term Disability Plan for Employees of Worthington Industries, 475 F. Supp. 2d 742, 746 (S.D. Ohio 2007), aff'd, 292 Fed. App'x 472 (6th Cir. 2008); McDonald, 347 F.3d at 169. LINA has provided a "reasoned explanation" based upon the medical evidence for its decision to credit the opinions of the independent medical examiners and file reviewers over that of Dr. Lisner.

The record reflects that between 1998 and 2004 Allen had extensive lab work performed, but none of these test results were positive for Lyme disease. Specifically, an October 1998 serum for Lyme disease testing showed an "equivocal" IgM and a negative IgG result. The Western Blot test, designed to be a confirmatory test, was negative for Lyme disease. (LINA-2_000046.) Similarly, lab work in January 1999 on Allen's serum, spinal fluid and urine came back either equivocal or negative for Lyme disease. LINA-2_000576-578; LINA-2_000582; LINA-2_002878.) A SPECT imaging of Allen's brain on January 27, 1999, showed "[m]oderate global hypoperfusion in a heterogeneous pattern which may be seen with vasculitis, Lyme disease, or other causes of encephalopathy." LINA-2_000597. However, infectious disease specialist Dr. Martinello warned "[t]he meaning of the SPECT test results is unclear and this test is widely acknowledged to be very non-specific." (LINA-2_002879.) See also Gent v. CUNA Mut. Ins. Co., 2008 WL 4083004, *7 (D. Mass. Sept. 2, 2008)(noting SPECT scans are only consistent with, and not diagnostic of, Lyme disease).

Further, LINA placed significance on Allen's varying accounts of when she allegedly contracted Lyme disease ranging from as early as 1992 to as late as the summer of 1996. (LINA-2_000567; LINA-2_000413; LINA-2_000451; LINA-2_000788; LINA-2_001320; LINA-2_000798.) The record also reflects that no physician witnesses the tick bites or rashes reported by Allen. (LINA-2_000571.) After conducting a neurological examination of Allen, Dr. Griffin found that "the claimant has no evidence of focal neurologic disease and her neurological examination is normal." (LINA-2_001255.) Dr. Griffin noted the "paucity of objective evidence regarding the claimant's diagnosis with Lyme disease and most especially a diagnosis of neurologic involvement." (Id.) Dr. Griffin concluded that Allen failed to prove she suffers from neurological impairment due

to Lyme disease. (Id.)  Similarly, based in part upon the equivocal or negative lab work, the lack of physician observation, and the IME conducted by Dr. Griffin, infectious disease specialists Drs. Greenhood and Martinello found the record lacked support for Allen's Lyme disease diagnosis or any physical limitations caused by an infectious disease.   Contrary to Allen's argument, the Plan Administrator considered all the evidence in the file, including the recommendations of Allen's treating physicians, and chose to rely on the final conclusions of Drs. Greenhood, Martinello and Griffin.  Whatever weight the Court may be inclined to give LINA's evidence, it was sufficient to support "a reasoned explanation" for LINA's denial of LTD benefits to Allen.

After reviewing the administrative record with due skepticism of LINA's decision because of the conflict of interest, the Court concludes that LINA's decision to deny Allen's claim for long-term disability income benefits is not arbitrary and capricious. The Court is satisfied that there is sufficient medical evidence to support LINA's conclusion that Allen does not suffer any restrictions due to Lyme disease or any other physical condition from January 1999 through the present that would preclude Allen from performing a sedentary occupation.

### F.  Plaintiff's Reimbursement Obligation

LINA argues that Allen's retroactive award of social security benefits reduces the amount of any LTD benefits previously paid under the Plan.  LINA maintains that Allen is required to reimburse it for the overpayment of LTD benefits for the period of January 1997 to January 1999. LINA argues that the matter must be remanded to the Plan Administrator for a determination of the reimbursement amount owed by Allen.

In May of 2000, the Social Security Administration awarded Allen retroactive disability benefits commencing October 4, 1996.  In January of 2002, Allen filed this instant action in response

to LINA's denial of her physical disability benefit claim. In its answer to Allen's Complaint, LINA asserted the Plan's right of offset as an affirmative defense to "any remedy granted by this Court." (Answer, ¶ 18.) However, it does not appear from the record that LINA ever made a claim against Allen for reimbursement of any disability benefits previously paid by LINA pursuant to the Plan. The Court has not granted any remedy to Allen and it will not consider this request as an independent claim now. Thus, the Court declines to remand this matter to the Plan Administrator for consideration of this claim.

### G. Defendant's Request for Attorneys' Fees, Costs, and Expenses

In its Motion for Judgment on the Administrative Record, LINA requests the Court to award attorneys' fees, costs, and expenses incurred in this action. LINA offers no support or documentation for its request and does not address the factors the Sixth Circuit instructs the courts to consider in determining whether an award is appropriate. Notwithstanding, the Court has reviewed 29 U.S.C. § 1132(g)(1) and the factors set forth in Schwartz v. Gregori, 160 F.3d 1116, 1119 (6th Cir. 1998) and denies LINA's request for attorneys' fees, costs, and expenses.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Plaintiff, Debbie Allen, for Summary Judgment on the Administrative Record [DN 39] is **denied** and the motion by Defendant, Life Insurance Company of North America, for Summary Judgment on the Administrative Record [DN 43] is **granted**. **IT IS FURTHER ORDERED** that Defendant's motion for attorneys' fees, costs, and expenses is **denied**. A judgment will be entered consistent with this opinion.


cc: counsel of record